IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| SWANE COMPANY, ) | |
| ) | No. 2:15-cv-02586 |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| BERKELEY COUNTY SOUTH ) | |
| CAROLINA; THOMPSON ) | |
| CONSTRUCTION GROUP, INC.; ) | |
| GREG A. THOMPSON, ) | |
| INDIVIDUALLY; AND JOSEPH ) | |
| BLANCHARD, INDIVIDUALLY ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the court on a motion to compel arbitration brought by defendants Thompson Construction Group, Inc. and Greg A. Thompson (together the "Thompson defendants"). For the reasons set forth below, the court grants the Thompson defendants' motion.

## I. BACKGROUND

The instant dispute arises from a Biosolids Offtake Agreement ("the Agreement") between plaintiff Swane Company ("plaintiff") and BioEnergy Technologies of Berkeley County, LLC d/b/a GenEarth ("BET"), the previous owner and operator of a renewable energy plant in Berkeley County, South Carolina. The Thompson defendants are principals or members of BET. Def.'s Mem. 1. Under the Agreement, BET sold plaintiff a byproduct of the plant's energy production process known as class A biosolid material (the "biosolid material"), which plaintiff removed from the plant and applied to nearby farmland. Id. at 1–2; Compl. ¶ 17.

1

The biosolid material emitted an obnoxious odor when applied to farmland, which prompted public complaints. Compl. ¶ 18, 21. BET promised to address these complaints at a Berkeley County Council Meeting in May 2014. Id. at ¶ 22. Despite these assurances and the availability of several alternative methods of reducing the obnoxious odor, BET did not take sufficient steps to reduce the odor, but instead wrongfully conspired with the Thompson defendants and others to have Berkeley County acquire BET's energy production facility and shut down its operations. Id. at ¶ 20, 23–35.

> The Agreement contains an arbitration clause, which provides that:
>
> In the event that a material dispute arises between the [p]arties concerning any aspect of this [a]greement, and/or amendments thereto, that dispute will be resolved by the [p]arties submitting the dispute to non-binding mediation. . . . If the mediation is unsuccessful in resolving the dispute, the parties agree to submit the matter to binding [a]rbitration with a mutually agreed upon arbitrator (or we could have someone or some law firm named to handle the arbitration), who is certified to handle legal disputes that would otherwise be adjudicated by the South Carolina Court of Common Pleas (this will drastically cut down on time, and costs).

Halbig Aff. Ex. 1.

Plaintiff filed its complaint in the instant action on April 26, 2015 in the South Carolina Court of Common Pleas for Berkeley County. The complaint asserts claims for tortious interference with contractual relations, civil conspiracy, and conversion against the Thompson defendants, Berkeley County, and Joseph Blanchard.[1] Defendant Berkeley County filed a notice of removal in this court on June 25, 2015, asserting federal question jurisdiction pursuant to 28 U.S.C. § 1441. The Thompson

---

[1] The complaint also brings claims for violation of substantive and procedural due process under the South Carolina and United States Constitutions, but those claims are only alleged against defendant Berkeley County.

2

defendants filed the instant motion to compel arbitration on July 2, 2015 pursuant to the arbitration clause in the Agreement.  On August 19, 2015, plaintiff filed a response to the Thompson defendants' motion, and on September 11, 2015, the Thompson defendants filed their reply in support of the motion.  This motion has been fully briefed and is ripe for the court's review.

## II.  STANDARD

The Thompson defendants move to compel arbitration under Section 4 of the Federal Arbitration Act ("FAA"), which provides in part that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.  Section 2 of the FAA states that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A court shall compel arbitration pursuant to the FAA if a party demonstrates:

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [a party] to arbitrate the dispute.

Id. (internal quotation marks omitted).  "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 23–24 (1983).  Although federal law governs the arbitrability of disputes, ordinary state-

law principles resolve issues regarding the formation of contracts. Am. Gen. Life & Acc. Ins. Co. v. Wood, 429 F.3d 83, 87 (4th Cir. 2005).

### III. DISCUSSION

Plaintiff argues that the Thompson defendants cannot demonstrate the second and third elements of the four-part test to compel arbitration because: (i) the FAA does not apply, as the transaction does not implicate interstate or foreign commerce, and (ii) even if the FAA applies, the Agreement does not contain a valid and enforceable arbitration provision. Plaintiff contends the Agreement's arbitration provision is not enforceable because: (i) the provision does not encompass the plaintiff's claims against the Thompson defendants, and (ii) the Thompson defendants, as non-signatories to the Agreement, are not entitled to enforce the arbitration clause. The court will address each argument in turn.

#### A. Applicability of FAA

Plaintiff first argues that the FAA does not apply in this case because the Agreement does not relate to interstate or foreign commerce. Pl.'s Resp. 3–5. The scope of the FAA is guided by the phrase "involving commerce" as used in § 2 of the FAA, which provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added). "The statute further defines 'commerce' to include 'commerce among the several [s]tates.'" Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003). The United States Supreme Court has interpreted the term "involving

commerce" to signal "the broadest permissible exercise of Congress' Commerce Clause power." Id.  Therefore, because the FAA's scope is coextensive with the "full reach of the Commerce Clause," id.; Dean v. Heritage Healthcare of Ridgeway, LLC, 759 S.E.2d 727, 731 (S.C. 2014), the court must ascertain whether the Agreement is within the regulatory scope of the Commerce Clause.

Courts have held that the Commerce Clause permits the regulation of local businesses that purchase substantial quantities of goods that have moved in interstate commerce.  See Citizens Bank, 539 U.S. at 57 (finding that because "the Commerce Clause gives Congress the power to regulate local business establishments purchasing substantial quantities of goods that have moved in interstate commerce, . . . it necessarily reaches substantial commercial loan transactions secured by such goods"); Katzenbach v. McClung, 379 U.S. 294, 304 (1964) (finding that Congress acted within its power to regulate commerce by extending regulation to restaurants that offered "food, a substantial portion of which had moved through interstate commerce"); McCutcheon v. THI of S.C. at Charleston, LLC, No. 2:11-cv-02861, 2011 WL 6318575, at *5 (D.S.C. Dec. 15, 2011) (finding that a nursing care provider's operations affected interstate commerce because food and other supplies were shipped across state lines to reach the nursing care facilities); Rainbow Health Care Ctr., Inc. v. Crutcher, 2008 WL 268321, at *5 (N.D. Okla. Jan. 29, 2008) (finding that an agreement between a nursing care provider and a resident involved interstate commerce because "about one quarter of [the nursing care providers'] expenditures for goods and services can be traced to interstate transactions"). Notably, such regulation is permitted even when it does not directly relate to the

interstate supply transactions.  See Katzenbach, 379 U.S. 294, 304–305 (holding that enforcement of the Civil Rights Act to prohibit a restaurant from refusing to serve black customers was constitutional because a substantial portion of the restaurant's food moved through interstate commerce); McCutcheon, 2011 WL 6318575, at *5 (finding that the FAA applied to contracts between nursing care patient and nursing care provider, where nursing care provider received supplies from out of state); Rainbow Health, 2008 WL 268321, at *5 (same as McCutcheon).

Plaintiff argues that the actual use of supplies acquired through interstate commerce is not sufficient to demonstrate that the Agreement involved interstate commerce, and that the court must instead make this determination by focusing on the Agreement's specific provisions and requirements.  Pl.'s Resp. 3–4.  Using this analysis, plaintiff contends, the Agreement does not touch on interstate commerce in any way.  Id. at 4.  Plaintiff specifically notes that the BET facility is located in Berkeley County, the waste used to produce electricity and the biosolid material comes from South Carolina, and the biosolid material is only applied to land within South Carolina.  Id.

Plaintiff relies on Timms v. Greene,  427 S.E.2d 642 (S.C. 1993), in which the Supreme Court of South Carolina determined that a contract between a nursing facility and a resident did not involve interstate commerce, despite the fact that many of the facility's goods, equipment, and supplies came from out of state.  The Timms court distinguished the nursing facility contract from contracts which are "clearly predicated upon transactions involving the purchase and use of materials and supplies from outside the state," and concluded that the nursing facility's purchase of out of

state supplies was not sufficiently related to the agreement to "form the basis of the contract between the parties." Timms, 427 S.E.2d at 644.

However, Timms was overruled in its entirety by Dean v. Heritage Healthcare of Ridgeway, LLC, 759 S.E.2d 727 (S.C. 2014).[2]  In Dean, the Supreme Court of South Carolina found that an agreement between a resident and a nursing facility did implicate interstate commerce because the agreement required the facility to provide meals and medical supplies, which the facility shipped across state lines from out-of-state vendors.  Id. at 732–33.  The Dean court referred to Timms as "a relic of the past, decided before the broad definition of interstate commerce set forth in Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265 (1995)." Id. at 733.  Thus, the court need not find that the interstate elements of the Agreement were so central as to "form the basis" of the Agreement.  See Id. at 732–33 (noting that Timms required courts to look to the basis of the contract between the parties, and overruling Timms in its entirety).  Since Allied Bruce and Dean, it is clear that an otherwise intrastate transaction involves interstate commerce when the parties perform their agreement using supplies acquired through interstate commerce.  See Id. (stating that "the meals and medical supplies," which were supplied through interstate commerce, must be considered in determining whether the parties' agreement involved interstate commerce "because the [] agreement specifically require[d] Appellants provide these goods and supplies").

---

[2]     Since the plaintiff relied on the Timms case and did not cite the Dean case, the court assumes that the plaintiff's lawyers' Westlaw™ was on the fritz, since they have a duty to disclose adverse precedent to the court.  There can be no more adverse precedent than failing to disclose a subsequent decision that calls the decision the plaintiff relies on a "relic of the past."

In this case, both parties acquired a number of crucial supplies from outside of South Carolina. Chemicals used to create the biosolid material and chemicals used to control odor in the energy production process were sourced from Georgia. Halbig Aff. ¶ 15. The equipment BET used to load plaintiff's trucks and to produce the biosolid material was also sourced from out of state. Id. Plaintiff, for its part, performed the Agreement using trucks, equipment, and fuel produced outside of South Carolina. Id. at ¶ 16. Without the supplies and equipment acquired through interstate commerce, neither party would have been able to perform its obligations under the Agreement.

Therefore, the court finds that the Agreement involves interstate commerce, and is subject to the FAA.[3]

### B. Scope of the Agreement

Plaintiff next argues that the claims in this action do not fall within the scope of the Agreement's arbitration provision.

"Arbitration is a matter of contract interpretation, and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 626–27 (4th Cir. 2006); Zabinski v. Bright Acres Associates, 553 S.E.2d 110, 118 (S.C. 2001). Courts apply state law in determining the scope of the parties' agreement to arbitrate disputes. Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 419 (4th Cir. 2000).

---

[3] Because the court finds that the FAA applies to the Agreement, the court also finds that the Agreement need not comply with the requirements of S.C. Code Ann. § 15–48–10(a). Federal and state courts have consistently held that "if the contract . . . involves interstate commerce, the FAA applies to the arbitration agreement at issue and the notice requirements of section 15–48–10 will not prevent its enforcement." Low Country Rural Health Educ. Consortium, Inc. v. Greenway Med. Technologies, Inc., No. 9:14-cv-00874, 2014 WL 5771850, at *5 (D.S.C. Nov. 5, 2014); Soil Remediation Co., 476 S.E.2d 149, 151–52 (S.C. 1996) ("If the arbitration agreement in the instant controversy is covered by the FAA, then . . . the FAA preempts S.C. Code Ann. § 15–48–10(a).")

Thus, the court must look to South Carolina law to determine whether the Agreement's arbitration provision covers plaintiff's claims.

The policy of South Carolina is to favor arbitration of disputes. <u>Zabinski</u>, 553 S.E.2d at 118. Although the intention of parties is relevant, as a matter of policy, arbitration agreements are liberally construed in favor of arbitrability. <u>Landers v. Fed. Deposit Ins. Corp.</u>, 739 S.E.2d 209, 213 (S.C. 2013). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . [and], unless the court can say with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute, arbitration should be ordered." <u>Zabinski</u>, 553 S.E.2d at 118. The presumption in favor of arbitration is "strengthened when an arbitration clause is broadly written," such as when language provides for arbitration of all disputes "arising out of or relating to" the contract. <u>Landers</u>, 739 S.E.2d at 213. In deciding whether an arbitration agreement encompasses a particular dispute, courts must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the label assigned to the claim. <u>Zabinski</u>, 553 S.E.2d at 118. "A broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." <u>Id.</u> at 119.

The Agreement's arbitration clause requires that the parties submit "material dispute[s] . . . concerning any aspect of [the] Agreement" to arbitration. Halbig Aff. Ex. 1, 14. This language is quite similar to the broad, "arising out of or relating to" language courts have found to strengthen the presumption in favor of arbitration. <u>See</u>

9

Landers, 739 S.E.2d at 213.  Such language has been found to encompass tort claims relating to the agreement in question.  Zabinski, 553 S.E.2d at 119 (finding that an arbitration provision which applied to "any controversy or claim arising out of the [] agreement" required arbitration of "any tort claims between the partners that relate to the [] agreement").  Therefore, plaintiff's claims cannot escape the reach of the arbitration provision simply because they do not seek to enforce the Agreement directly.  Instead, the focus of the inquiry is on the "factual allegations underlying the claim[s]," and whether plaintiff's factual allegations evince a significant relationship between the claims and the Agreement.  Id. at 118, 119 n.4.

A review of plaintiff's complaint reveals that the contractual rights established by the Agreement form a crucial part of the factual basis for plaintiff's claims. Plaintiff's tortious interference and civil conspiracy claims necessarily depend on the validity of, and the defendants' knowledge of, plaintiff's "exclusive rights to all of BET's product, regardless of its form" under the Agreement.  Pl.'s Comp. ¶¶ 43–50, 53–54.  Plaintiff's conversion claim is similarly premised on the assertion that the biosolid material remaining at the BET facility is subject to "[plaintiff's] right to offtake . . . pursuant to its contract with BET."  Id. at ¶ 59.  Given this dependence on the existence of contractual rights under the Agreement, the court finds that a "significant relationship" exists between plaintiff's claims and the Agreement.

Therefore, the court finds that the subject matter of plaintiff's claims falls within the scope of the Agreement's arbitration provision.

### C. Non-signatory Defendant's Ability to Compel Arbitration of Signatory Plaintiff's Claims

Plaintiff also argues that, regardless of the claims' subject matter, the Thompson defendants cannot compel arbitration because they are not signatories to the Agreement.[4] Pl.'s Resp. 7. Plaintiff recognizes that courts have allowed non-signatories to compel arbitration based on the principle of equitable estoppel,[5] but nevertheless contends that equitable estoppel is inapplicable here, because plaintiff's claims do not seek to enforce or otherwise benefit from the Agreement. Id. 7–8.

Before turning to the standard used to apply the principle of equitable estoppel, the court notes that much of the equitable estoppel doctrine in this circuit was originally developed in cases applying "the 'federal substantive law o[f]

---

[4] Plaintiff contests the Thompson defendants' capacity to compel arbitration in two ways: first, by arguing that the scope of the arbitration clause under the Agreement does not extend to claims against non-signatory defendants, and second, by arguing that the Thompson defendants cannot compel arbitration under the principles of equitable estoppel. However, because the court finds that the doctrine of equitable estoppel applies to this case, and the doctrine of equitable estoppel allows a non-signatory defendant to "compel arbitration, despite the fact that the signatory and non-signatory lack an agreement to arbitrate," Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006), it is unnecessary to assess plaintiff's first argument, that the Agreement does not cover claims against non-signatory defendants.

[5] Though the parties' briefs focused on the principle of equitable estoppel, the court notes that equitable estoppel is but one of a number of "'common law principles of contract and agency law' [that] could provide a basis 'for binding non-signatories to arbitration agreements[, including]: 1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel." Pearson, 733 S.E.2d at 601 (citing Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)); see also Malloy v. Thompson, 762 S.E.2d 690, 692 (S.C. 2014) (citing Pearson's enumeration of five theories listed above but noting that none of those theories applied to the facts of that case); Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 417 (4th Cir. 2000) (citing Thompson-CSF with approval for theories that provide a basis for binding non-signatories to arbitration agreements).

The court further notes that equitable estoppel is not the only common law principle applicable to the instant case. South Carolina has recognized that non-signatories who are alter egos of a signatory may compel arbitration. Ridgeway v. Litchfield Co. of S. C. P'ship, 2004 WL 6339730 (S.C. Ct. App. Dec. 15, 2004) (citing S. Carolina Pub. Serv. Auth. v. Great W. Coal (Ky), Inc., 437 S.E.2d 22, 24–25 (S.C. 1993). Here, plaintiff directly alleges that the Thompson defendants are alter egos of BET. Compl. ¶ 10–11. In fact, the Thompson defendants' relationship with BET is the entire basis for plaintiff's claims against them. Id. at ¶ 46, 52, 57 (alleging the Thompson defendants negotiated and procured the contract between BET and Berkeley County for the sale of the BET facility, and conspired to shut down BET's operations). Plaintiff should not be permitted to bring claims that rely on the Thompson defendants' status as BET's alter egos, while simultaneously denying that status to avoid arbitration of those claims.

11

arbitrability.'" Goer v. Jasco Indus., Inc., 395 F. Supp. 2d 308, 312 n.6 (D.S.C. 2005) ("Because the question of whether [defendant], a non-signatory, may enforce the arbitration clause in the employment contracts entered into between the [plaintiffs] and [a non-party] presents no state law question of contract formation or validity, the court applies the 'federal substantive law or arbitrability' to the present dispute.") (citing Int'l Paper Co., 206 F.3d at 417 n.4). However, in Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630 (2009), the United States Supreme Court stated that the FAA does not "purport[] to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)," and held that a non-party to an agreement was entitled to invoke the FAA "if the relevant state contract law allows him to enforce the agreement." Id. at 630, 632.

Following the Supreme Court's decision in Arthur Andersen, South Carolina state courts have continued to cite pre-Arthur Andersen cases when addressing the equitable estoppel issue. See Malloy v. Thompson, 762 S.E.2d 690, 692 (S.C. 2014) (citing Pearson v. Hilton Head Hosp., 733 S.E.2d 597 (Ct. App. 2012) which quotes Int'l Paper, in listing theories that provide a basis for binding non-signatories to arbitration).[6] Thus, it appears that South Carolina courts have adopted the analysis used in the pre-Arthur Andersen cases applying federal law. See Klopfer v. Queens Gap Mountain, LLC, 816 F. Supp. 2d 281, 296 (W.D.N.C. 2011) (finding that North Carolina's law of equitable estoppel is the same as Fourth Circuit law, citing to a North Carolina decision which followed Fourth Circuit law on the issue). This

---

[6] Though the court in Pearson indicated that it also intended to apply federal law, see Pearson, 733 S.E.2d at 601 ("Because the determination of whether a nonsignatory is bound by a contract presents no state law question of contract formation or validity, the court looks to the federal substantive law of arbitrability to resolve the question."), the Supreme Court of South Carolina in Malloy made no such indication.

understanding of South Carolina law is bolstered by the fact that the rules announced under the "federal substantive law of arbitrability" were originally derived from traditional state law principles.  See Int'l Paper, 206 F.3d at 416–18 (recognizing equitable estoppel as one of the "[w]ell-established common law principles [which] dictate that in an appropriate case a non-signatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties.").  Given South Carolina courts' recent treatment of the issue and the state law origin of the equitable estoppel doctrine, the court will construe South Carolina law as having embraced the approach applied by pre-Arthur Andersen cases that addressed the issue under federal law.

These cases recognize that even when a "signatory and non-signatory lack an agreement to arbitrate" the principle of equitable estoppel allows a non-signatory to compel arbitration.  Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006).  Equitable estoppel allows a non-signatory to compel arbitration of claims brought by a signatory when the claims are "inextricably intertwined" with the underlying agreement.  Goer, 395 F. Supp. 2d at 315.  When non-signatory defendants seek to avail themselves of an arbitration clause contained in agreement entered into by the plaintiff "[t]he essential question . . . is whether [the] [p]laintiff[] would have an independent right to recover against the non-signatory [d]efendant[] even if the contract containing the arbitration clause were void."  Id. at 314–15 (quoting Miron v. BDO Seidman, LLP, 342 F.Supp.2d 324, 333 (E.D.Pa.2004)).  More specifically:

> [E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the . . .

> agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.

Am. Bankers Ins. Grp., 453 F.3d at 627 (quoting Brantley v. Republic Mortgage Ins. Co., 424 F.3d 392, 396 (4th Cir. 2005)).  This analysis requires an examination of the underlying complaint to ascertain the nature of the signatory's claims against the non-signatory.  Id.

A review of the complaint reveals that plaintiff's claims clearly meet this requirement.  As discussed above in section III.B., plaintiff's claims all make reference to the Agreement and are all premised on the plaintiff's contractual rights under the Agreement.  Pl.'s Comp. ¶¶ 43–50, 53–54, 59.  This reliance shows that plaintiff does not have any right to recover against the Thompson defendants that is independent of the Agreement.

Therefore, the court finds that, even if the Agreement's arbitration provision does not directly apply to the disputes in this case, the plaintiff is nevertheless equitably estopped from avoiding arbitration under the Agreement.

## IV.  CONCLUSION

For the foregoing reasons the court **GRANTS** the Thompson defendants' motion to compel arbitration.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 30, 2015**
**Charleston, South Carolina**